1
2
3
4
5          UNITED STATES DISTRICT COURT
6          NORTHERN DISTRICT OF CALIFORNIA
7
8  LARRY J. TOMASEK ,                          Case No. C-06-07805 JCS

9          Plaintiff,                          **ORDER GRANTING IN PART AND
                                               DENYING IN PART DEFENDANT'S**
10         v.                                  **MOTION FOR SUMMARY JUDGMENT,
                                               GRANTING IN PART AND DENYING IN**
11 MICHAEL J. ASTRUE, COMMISSIONER            **PART  PLAINTIFF'S MOTION FOR**
   OF SOCIAL SECURITY,                         **SUMMARY JUDGMENT AND**
12                                             **REMANDING FOR FURTHER**
           Defendant.                          **PROCEEDINGS [Docket Nos. 14, 17]**
13 _____/

14 **I.     INTRODUCTION**

15         Plaintiff, Larry Tomasek, filed a complaint on December 20, 2006, seeking review of the

16 final decision of the Commissioner of the Social Security Administration ("Commissioner") denying

17 his Application for Disability Insurance benefits under Title II of the Social Security Act ("SSA").

18 Plaintiff asks the Court to reverse the Commissioner's denial of Disability Insurance benefits and

19 remand with instructions to award benefits or, in the alternative, to remand for additional

20 administrative proceedings.

21         Prior to the present application, Plaintiff filed three previous Title II applications for

22 disability benefits, on January 16, 1998, January 6, 1999, and October 10, 2000.  These applications

23 were denied in a decision dated June 24, 2002.  Plaintiff did not appeal the June 24, 2002 decision

24 and, therefore, that decision is the final decision of the Commissioner.

25         On September 26, 2002, Plaintiff filed the Title II application at issue in this case, seeking a

26 period of disability and disability insurance benefits.  Administrative Record ("AR") at 91.  The

27 Social Security Administration denied the application initially and again on reconsideration.  AR at

28 57-67.  Plaintiff filed a request for hearing on July 13, 2004.  AR at 67.  Plaintiff, proceeding pro se,

and Malcolm Brodzinsky, M.A., an independent vocational consultant, appeared and testified at the hearing, before Administrative Law Judge ("ALJ") Richard P. Laverdure, on March 1, 2005. AR at 74-90. In a decision dated May 24, 2005, the ALJ found that Plaintiff was not entitled to a period of disability and disability insurance benefits under Title II of the SSA. AR at 40. Plaintiff requested administrative review, and the Appeals Council denied his request on October 16, 2006, making the ALJ's decision the final decision of the Commissioner. AR at 8.

Plaintiff filed a motion for summary judgment pursuant to 42 U.S.C. § 405(g). The Commissioner responded with a cross-motion for summary judgment. The parties have consented to the jurisdiction of the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c).

## II.   BACKGROUND

### A.   Plaintiff's Background

Plaintiff was born in Marin County, California, in 1958. AR at 91. Plaintiff was 46 years old at the time of his administrative hearing. AR at 34. At the administrative hearing, Plaintiff testified that he had a high school education. AR at 34. He speaks, reads, and writes English fluently. AR at 97. At the time of his application he lived with his wife and two children. AR at 93.

### B.   Plaintiff's Work History

Plaintiff's relevant past work includes work as a plumber, inventory clerk, and shipping and receiving clerk. AR at 99, 116, 117, 119. He worked as a plumber for approximately 20 years, from 1976 to 1996. *Id*. This job entailed residential, commercial, and industrial plumbing, demolition, remodeling, and lay-out. *Id*. Plaintiff worked as an inventory temporary clerk from 1999 to 2000, and then as a shipping and receiving clerk for approximately one month in 2000. *Id*. The record contains no evidence of Plaintiff engaging in substantial gainful activity during the adjudicative period, which the ALJ found to be June 25, 2002, through December 31, 2003 (as discussed below).

### C.   Plaintiff's Medical History

Plaintiff alleges that he is disabled on the basis of the following diagnosed conditions: 1) Complex Regional Pain Syndrome of his non-dominant right upper extremity, and 2) bilateral multiple upper extremity neuropathies. The evidence in the record relating to these conditions is summarized below.

**1.  Patient's Progress Reports submitted by Plaintiff's Primary Treating Physicians at Kaiser Permanente as of 2000**

The medical evidence shows that Plaintiff received ongoing medical care for pain complaints and medication refills at Kaiser Permanente.  AR at 226-378.  The Record shows that as of 2000, Plaintiff's treating physicians at Kaiser, Dr. Charles Evans and Dr. Konstantin Zaharoff, diagnosed him with a complex regional pain syndrome ("CRPS") of his right  upper extremity ("RUE").  *See*, *e.g.*, AR at 227.  In addition, these doctors diagnosed Plaintiff variously with "painful" multiple bilateral peripheral neuropathies in upper extremities, *see*, *e.g.*, AR at 242 (referring to "bilateral upper extremity peripheral neuropathies, painful"), AR at 257 (referring to "the left arm peripheral neuropathy pain"), 263 (referring to "multiple neuropathies with the upper extremities; right greater than left, with intermittent discomfort in the palm and the forearm of the left arm"), and Complex Regional Pain Syndrome ("CRPS") in both arms.  AR at 232 (diagnosing Plaintiff with "complex regional pain syndrome upper extremities"), AR at 280 (diagnosing Plaintiff with "CRPS Right + probably Left Arms").

In March 2002, Plaintiff underwent a fluoroscopically guided cervical epidural simulator lead percutaneous placement. AR at 266.  The surgery was performed by Dr. Evans.  *Id.*

**2.  Reevaluation by David Kneapler, MD (Agreed Medical Examiner)**

The Administrative Record shows that since the June 2002 decision, Plaintiff submitted as additional documentary evidence a report from Dr. David Kneapler, dated February 14, 2003.  AR at 173.  This report was acknowledged by the ALJ during the  hearing in ascertaining whether Plaintiff proved changed circumstances.  AR at 439.  In his report, Dr. Kneapler incorporated additional data contained in prior reports, dated May 14, 2001, and July 23, 2001.

Dr. Kneapler noted that Plaintiff sustained three periods of cumulative trauma: the first two from his employment as a plumber, and the third, from his subsequent employment.  AR at 176.  The first two resulted in cumulative trauma to this dominant right upper extremity, and the third resulted in cumulative trauma to his dominant right upper extremity and cervical spine.  *Id.*  Dr. Kneapler further found the following: Plaintiff's permanent disability of his cervical spine precluded very heavy work and overhead work due to discomfort from Plaintiff's cervical epidural leads;

Plaintiff's dominant right upper extremity disability is 40 percent loss of strenuous gripping or handling, or repetitive gripping, handling, or fingering; Plaintiff has lost 40 percent pre-injury left upper extremity strenuous gripping or handling, or repetitive gripping, handling, or fingering. AR at 178-79. Dr. Kneapler attributed Plaintiff's left upper extremity disability equally to the first two periods of cumulative trauma. AR at 179. In describing Plaintiff's condition, he noted that Plaintiff had "discomfort, sweating and color change of his left hand and wrist, but not nearly as prominent as the right [hand and wrist]" and that "he gets pain mainly when he overuses his left hand and wrist." AR at 174.

### 3. Medical Report from William H. Ramsey, MD (Orthopedic Qualified Medical Expert)

Dr. Ramsey interviewed and examined Plaintiff in connection with Plaintiff's complaints of pain in his neck and upper extremities. AR at 202. In his report, dated March 12, 2003, Dr. Ramsey stated that Plaintiff's presentation was consistent, and Plaintiff did not appear to exaggerate his pain or overreact to examination. AR at 204. Dr. Ramsey further stated that Plaintiff's back and neck were straight; the shoulders were leveled; the neck exhibited a reasonably normal cervical lordosis; the shoulders demonstrated no atrophy, deformity or discoloration; the shoulders demonstrated some tenderness over the anterior aspect of the right side; the range of motion of his neck included an estimated 75 percent normal flexion and extension; abduction strength of the shoulders against resistance was excellent bilaterally; a trace of crepitation was occasionally detected from the right shoulder but not the left; his elbows demonstrated normal alignment, and normal range of motion; Tinel's sign over the area was locally sensitive but did not reproduce median nerve paresthesias; the left side was negative as to Tinel's sign. AR at 205.

In reviewing Plaintiff's medical records, and referring to Dr. Kneapler's findings, Dr. Ramsey noted that Dr. Kneapler's findings were similar to his own. AR at 206. In summarizing Plaintiff's medical history, Dr. Ramsey noted that Plaintiff was diagnosed with CRPS, and stopped work in July 2000. AR at 209. Although Plaintiff's difficulties mainly involved his right upper extremities, AR at 209, "[t]here was also report of increasing discomfort in the left upper extremity attributed to compensating for the right." AR at 207. Dr. Ramsey characterized Plaintiff's

symptoms as to his left hand and wrist as "minor discomfort . . . considered occasional and slight." AR at 210. Dr. Ramsey also noted that Plaintiff underwent extensive treatment with only modest improvement, and that the electrical stimulator implanted in the Plaintiff's cervical area functioned satisfactorily. AR at 209-10.

In recommending work preclusion, Dr. Ramsey stated that Plaintiff should be precluded from forceful activities with the right upper extremity since the contemplated loss was approximately 50% for lifting, pushing or pulling, grasping, pinching, or holding. AR at 210. Dr. Ramsey also recommended that Plaintiff be precluded from overhead activities with the neck or right upper extremity, and from prolonged immobility such as sitting or driving without at least a few minutes of relief every 45 minutes. AR 210-11. Dr. Ramsey further recommended preclusion from repetitive manipulation with the right hand, contemplating a loss of about 50 percent of capacity for activities requiring finger dexterity. AR at 211.

Dr. Ramsey indicated that Plaintiff's left-hand did not require any work preclusion. AR at 211.

### 4. Psychiatric Evaluation by Timothy Canty, M.D.

On December 7, 2003, Timothy Canty, M.D., performed a psychological exam of Plaintiff at the request of Social Security Administration, for the purpose of disability evaluation. AR at 379. The chief complaint of the Plaintiff was: "I have chronic regional pain syndrome in my right arm and neck." Plaintiff also stated that "he had bilateral carpal tunnel surgery in 1995 and then he began having right wrist problems around 1996, which progressed to a regional pain syndrome." Regarding Plaintiff's mental status, Dr. Canty noted that Plaintiff's thoughts were clear and logical, Plaintiff had no psychosis and denied any homicidal or suicidal ideation. AR at 380. Dr. Canty found that while Plaintiff presented a situation of irritability and frustration secondary to his pain, Plaintiff's mood was good overall. AR at 382. Dr. Canty observed that Plaintiff appeared highly motivated for rehabilitation and would likely benefit from retraining in a job that would physically meet his needs. AR at 382. Dr. Canty anticipated that if retraining occurred, Plaintiff's irritability and frustrations would greatly decrease. AR at 382. Dr. Canty concluded that Plaintiff was psychiatrically fully functional. AR at 382.

### 5. Physical Residual Functional Capacity Assessments

The record contains two Residual Functional Capacity Assessments, dated May 7, 2004, and May 9, 2003. The two assessments are substantially similar. *See* AR 216 and 392. Both assessments recommend the following limitations: occasionally lift and/or carry ten pounds maximum; frequently lift and/or carry ten pounds maximum; stand and/or walk (with normal breaks) for a total of about six hours in an eight-hour workday; sit (with normal breaks) for a total of about six hours in an eight-hour workday. Both assessments recommend limited pushing and/or pulling in the upper extremities, and prohibit pushing or pulling in the right upper extremity. AR at 216 and 392. The May 9, 2003 assessment mentions that Plaintiff may need a 2-3 minute break when sitting, every 45 minutes or so. AR 393. Under "Manipulative Limitations," the boxes indicating "Reaching," "Handling," "Fingering," and "Feeling" are marked as "Limited" (rather than unlimited) on both assessments. *See* AR at 218, 394. In addition, both assessments include explanatory notes that are difficult to decipher (both because of the handwriting on the forms and the poor quality of the copies provided to the Court). These notes seem to indicate that the individuals who completed the forms found that as to Plaintiff's right side, he was restricted as follows: no overhead reaching, occasional reaching in other directions; no repetitive forceful grip; no repetitive fingering (e.g., typing); no work requiring discrete finger sensations. AR at 218 and 394. Neither assessment lists any visual, communicative, or environmental limitations. *Id.*

It is unclear who completed these forms as the signatures on both are illegible.

### 6. DDS Consultation Requests dated 7/17/03 - 5/13/04

The Administrative Record includes recommendations by DDS physicians who reviewed Plaintiff's records but did not examine him. A Dr. M. Gollub completed a report dated May 13, 2004, in which he recommended a 2-3 minute break after sitting for 45 minutes. AR at 401. Dr. Gollub noted that Dr. Ramsey recommended no LUE limitations, while Dr. Kneapler thought LUE was "somewhat limited." *Id.* Dr. Gollub concluded that Plaintiff was "mostly credible but not completely." *Id.*

The Administrative Record also includes an opinion from another DDS physician, whose signature is illegible (AR at 403), dated April 20, 2004. The report mentions a "marked coolness in both hands," and also states that "LUE shows some palmar discomfort." AR at 402.

In a report dated July 10, 2003, DDS Consultant Dr. Charlotte Bible, a psychiatrist, stated:

> In regard to this specific case, I find that the claimant cannot do any SGA, not even simple tasks, due to the limitations caused by his pain. This is a man who has complex regional pain syndrome, well-documented. He has had 14 surgeries, acupuncture, pain management classes, and uses an electrical stimulator to mask the pain. In his ADLS, as reported by phone call, he is entirely credible. In my opinion, he is not able to work due to intermittent marked impairments in daily activities, social relations, and in concentration, persistence, regular attendance and regular schedule, due to pain.

AR at 408.

**D.      Plaintiff's 2002 and 2003 Daily Activities Questionnaires**

The Administrative Record contains two Daily Activities Questionnaires. In the 2002 Exertional Daily Activities Questionnaire (AR at 111), Plaintiff declared that his daily activities depended on his pain levels. Plaintiff also stated the following: he was able to care for himself as far as bathing, shaving, and grooming, and experienced occasional pain in the right upper extremities while doing so; he was able to do the dishes and cook, but when he had flare-ups his wife and children would help or finish for him; he could walk up to 7-8 blocks while occasionally experiencing pain in the right shoulder; he climbed stairs; he did grocery shopping; he lifted and carried groceries, laundry, and the garden hose; if his wrist did not hurt, he vacuumed for 10 to 15 minutes, cleaned windows, and wiped the dust in the house; he drove his children to school for 20 to 25 minutes; he could drive for up to 45 minutes; he did some yard work or cleaned his car, usually with the help of his son; if he overdid some tasks he needed to take pain medication and rest for at least one hour. AR. 111-115.

In the Daily Activities Questionnaire dated November 14, 2003, Plaintiff indicated that he attended vocational rehabilitation training in AutoCAD and Voice Recognition, and hoped to return to "some kind of work." AR at 133. Plaintiff declared that he needed to wake up three to six times per night to adjust his electronic stimulator implant and takes sleep medication. AR at 133. In caring for his personal needs, Plaintiff sometimes had problems with shaving and rinsing his hair in

the shower, taking his shirt off, and bending over to tie his shoes. AR at 133. Washing dishes and vacuuming caused his pain to flare up. AR at 134. Plaintiff stated that he "tried doing some cleaning" on his car. AR at 134. Plaintiff further stated that he watched TV or listened to the radio, but had difficulty with focusing if he had a flare-up or his stimulator was turned up; if he went out once or twice during the day, then he could not go anywhere for two or three days; he had difficulties getting in and out of the car due to the electrodes in his neck. AR at 135. Plaintiff further stated that he gets "uncomfortable and tense in loud places or around too many people," and does not like to travel far because he never knows when he needs to lay down or take a break. AR at 136. In explaining how his condition prevented him from working, Plaintiff stated: "Constant flare-ups with activity or just out of nowhere when stimulator is turned up for long periods of time[.] I get very edgy and tense. Sharp jolts with movement at times from stimulator, pains in hands, mainly RT side, neck, upper back, RT shoulder." To the question whether he lost his job as a result of his condition, Plaintiff answered: "Back in July of 2000, [I] was pulled from work due to increasing problems with RDS or CRPS that was probably a result from previous employment as a plumber for 20 years and multiple surgeries to my hands (Bi-Lateral Carpal Tunnel Release, Ulnar Decompression, Orthoscopic Surgery on wrist)." AR at 137.

### E.    Function Report by Plaintiff's Wife

Plaintiff's wife completed a form entitled "Function Report - Adult - Third Party," dated November 10, 2003. AR at 124-32. In it, Plaintiff's wife states, in relevant part, the following: Plaintiff does not do much during the day, unless he has class; he goes to bed early, and takes a nap during the day, depending on his pain levels; he is awake a lot at night because he needs to adjust his stimulator every hour; Plaintiff's condition sometimes affects his ability to take his shirt off, but he is overall able to care for himself; Plaintiff prepares his own meals, one or two times pers week, but cannot do barbeque since his condition began; Plaintiff does some cleaning, but cannot fold the laundry, mow the lawn or vacuum; the time allocated for these chores depends on his pain levels; Plaintiff gets very frustrated with himself and needs encouragement when he has difficulty with accomplishing these tasks; he drops things sometimes; he goes outside one or two times per week, depending on his pain levels; he stays home a lot, being afraid that his pain will flare up; Plaintiff

8

does grocery shopping once or twice a month, but he needs help with carrying the bags; Plaintiff's ability to pursue his hobbies and interests depends on his pain; Plaintiff does not do any social activities on a regular basis; when Plaintiff is in pain, he has problems getting along with his family. AR at 124-28. Further, Plaintiff's wife stated that his condition affects the following: lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair-climbing, using hands, completing tasks, concentration. AR at 129.

Plaintiff's wife also declared that Plaintiff is left-handed. AR at 129. According to Plaintiff's wife, Plaintiff can walk around the block, and if he needs to rest "usually he does not walk for a few days." AR at 129. She further declared that stress causes his pain to flare up, and that he has difficulty in handling changes to his routine. AR at 130. Finally, Plaintiff's wife noted that Plaintiff uses an implanted electric stimulator every day and night. AR at 130.

### F.    The Administrative Hearing

The ALJ held an administrative hearing on Plaintiff's claim for disability insurance benefits on March 1, 2005. Present at the hearing were Plaintiff, proceeding in pro se, and Malcolm Brozinsky, a vocational expert ("VE"). AR at 435. The ALJ opened the hearing by addressing the fact that Plaintiff was unrepresented:

> ALJ:  [. . .] Mr. Tomasek, I know you've been through this process
> before because I issued a decision previously in your case. You were
> then represented by an attorney, correct?
>
> CLMT: Correct.
>
> ALJ:  And you are here today unrepresented. I presume you know
> you're right [sic] to representation because you had an attorney
> previously. Are you choosing to proceed here today on your own
> behalf?
>
> CLMT: Yes, yes.

AR at 437. Next, the ALJ explained that due to the prior unfavorable decision, unless Plaintiff brought new material evidence as to the earlier periods of disability that justified reopening those decisions, the adjudicatory period would be June 25, 2002 (the day after the denial of his previous application became final) to December 31, 2003 (Plaintiff's date last insured). AR at 438-40. The ALJ also explained that the prior unfavorable decision established a presumption of non-disability,

and that Plaintiff had the burden of rebutting that presumption by showing a change in his circumstances. AR at 439. The Record shows that the ALJ identified as an additional piece of documentation a report by "Dr. Niebler" (apparently a reference to Dr. Kneapler), dated February 14, 2003.

During the hearing, Plaintiff testified that he wrote with his left hand, but "had traditionally done other things with the right hand." AR at 441-42. In response to the ALJ's questions as to what had changed in Plaintiff's condition since the last hearing in 2002, Plaintiff testified that he had experienced a lot of headaches and pains in his neck. Plaintiff stated that in August 2005, he had surgery to reposition the stimulator's leads in his neck. He also testified that when he made sudden moves, like coughing, he would get jolted a lot. AR at 443. He further indicated that while doing the AutoCAD training, he practiced with his left hand, and he started having problems with it. Plaintiff indicated that he showed Dr. Evans that his left hand gets "red and blue," and he feels sharp pains in his wrist. AR at 443. Plaintiff further testified that he drove when necessary. AR 445. He testified that on a daily basis he walks the dog, goes to the post office, does light work around the house, does some gardening, and cleans his car occasionally. AR at 445. Plaintiff also stated that he quit shooting pool before the 2002 hearing. AR at 445.

As to his AutoCAD training, Plaintiff testified that he did not get any job offers after completing the training. AR at 449. He explained that his biggest problem was reliability due to his flare-ups: he might wake up with pains in the morning, or he might work for an hour on the computer and would need to stop because of pain in his hand. AR at 449. Plaintiff testified that he also enrolled into a voice recognition software class, but the software is "way too slow and it does not pay off." AR at 449.

Plaintiff also testified that in response to his condition, he attempted to use his left hand more, even though he had been right-handed. AR at 450. He indicated that he learned to do a lot of handling and manipulation with his left hand in terms of writing and mouse-work. AR at 452. He testified that after he began using his left hand more, though, he started having problems with his left palm. AR at 450.

The VE testified that Plaintiff undertook a vocational rehabilitation training program in computer assisted drafting ("AutoCAD") for nine weeks and four days, which rendered him semi-skilled. AR at 448. The VE confirmed that AutoCAD was a sedentary position. AR at 448.

The hypothetical formulated by the ALJ to the VE stated in relevant part: "Assume someone the claimant's age, education and experience and assume the capacity for light work with the exception of a 10 pound maximum restriction. So standing and walking are not affected but maximum weight that can be lifted and carried is 10 pounds. And with the right upper extremity no overhead reaching, otherwise reaching is occasional. No pushing or pulling, no repetitive forceful gripping and grasping. . . . All on the right . . . No repetitive fine manipulation . . . no discrete digital sensory input . . . . On the right." AR at 450. The ALJ did not include in his hypothetical any limitations on the left side. AR at 452.

Based on the ALJ's hypothetical, the VE testified that the Plaintiff would be physically able to perform computer-aided drafting, although the VE testified later that he did not believe Plaintiff had sufficient training to work in that field. AR at 452, 459. The VE also testified that Plaintiff could perform the following unskilled work with the physical limitations in the hypothetical: food and beverage order clerk, unskilled cashier, and telephone quotations clerk. AR at 452-54. Subsequently, the ALJ added as an additional limitation the requirement that the hypothetical individual must take a break from sitting or standing every 45 minutes. The VE confirmed that each of the jobs mentioned in response to the initial hypothetical could still be performed with the additional limitation. AR at 455.

Plaintiff expressed his concern that his unpredictable pain levels would affect his work reliability. AR at 457. Plaintiff indicated that some days he cannot perform any keyboard, mouse or computer work, and he needs to lay in bed the whole day. AR at 457. Plaintiff stated that this happens "[m]aybe once, twice a week sometimes." AR at 457. The VE testified that the unskilled jobs he mentioned allow two to three unscheduled absences monthly. AR at 458.

### G. The ALJ's Five-Step Analysis and Findings of Fact

Disability insurance benefits are available under the Social Security Act when an eligible claimant is unable "to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 423(a)(1). A claimant is only found disabled if his physical or mental impairments are of such severity that he is not only unable to do his previous work, but also "cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 4239(d)(2)(A). The claimant bears the burden of proof in establishing a disability. *Gomez v. Chater*, 74 F.3d 967, 970 (9th Cir.), *cert. denied*, 519 U.S. 881 (1996).

The Commissioner has established a sequential five-part evaluation process to determine whether a claimant is disabled under the Social Security Act. 20 C.F.R. § 404.1520(a). At Step One, the Commissioner considers whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. § 1520(a)(4)(I). If he is, the Commissioner finds that the claimant is not disabled, and the evaluation ends. If the claimant is not engaged in substantial gainful activity, the Commissioner proceeds to Step Two.

At Step Two, the Commissioner considers whether the claimant has "a severe medically determinable physical or mental impairment," or combination of such impairments, which meets the duration requirement in 20 C.F.R. § 404.1509. An impairment is severe if it "significantly limits [the claimant's] physical or mental ability to do basic work activities." C.F.R. § 404.1520(c). In addition, the physical or mental impairment (or combination of impairments) must have lasted, or must be expected to last, for a continuous period of 12 months. 20 C.F.R. § 404.1520(a)(4)(ii); 20 C.F.R. § 404.1509. If the claimant does not have a severe impairment for the required duration, the Commissioner finds the claimant not disabled and the evaluation ends at this step. C.F.R. § 404.1520(c). Age, education, and work experience are not considered at this step. *Id*.

At Step Three, the Commissioner considers whether the claimant's impairment, or impairments, "meets or equals" one of the Social Security Administration's compiled listings of impairments that the Commissioner has established as disabling. 20 C.F.R. § 404.1520(a)(4)(iii). If the claimant's impairment meets one of these listed impairments, the Commissioner will find the

claimant disabled.  If the impairment does not meet one of the listed impairments, the process continues to Step Four.

At Step Four, the Commissioner considers whether the claimant, in light of his residual functional capacity ("RFC"), can continue to perform work he has performed in the past. 20 C.F.R. § 404.1520(a)(4)(iv).  Based on the relevant medical evidence and other evidence in the record, the Commissioner will assess the claimant's RFC to determine whether the claimant can do his past work.  20 C.F.R. § 404.125(e).  If the RFC assessment determines that the claimant can perform his past work, the Commissioner will find him not disabled.  20 C.F.R. § 404.1520(f).  If the RFC assessment determines that the claimant cannot perform his past work, then the claimant proceeds to Step Five of the evaluation.

At Step Five, the Commissioner considers the claimant's RFC, age, education, and work experience to determine whether the claimant can "make an adjustment to other work."  20 C.F.R. § 404.1520(a)(4)(v).  If the claimant cannot make an adjustment to other work, the Commissioner will find him disabled.  *Id.*  At Step Five, the burden shifts to the Commissioner to show that the claimant, in light of his impairments, age, education, and work experience, can adjust to other work in the national economy, and that such a job actually exists.  *Distasio v. Shalala*, 47 F.3d 348, 349 (9th Cir. 1995).

Finally, a prior administrative finding of non-disability gives rise to a presumption of continuing non-disability that can only be overcome if the claimant proves "changed circumstances" indicating a more severe condition.  *Chavez v. Bowen*, 844 F.2d 691, 693 (9th Cir. 1988).

In this case, the ALJ began by finding that Plaintiff had established changed circumstances sufficient to overcome the presumption of non-disability, but that there was no good cause for reopening the prior decisions.  Therefore, he determined that the relevant period was June 25, 2002, to December 31, 2003.

The ALJ found at Step One of the evaluation process that Plaintiff had not engaged in any substantial gainful activity during the adjudicative period from June 25, 2002, through December 31, 2003.  AR at 34.

At Step Two, the ALJ found that the claimant's medically determinable impairment was a complex regional pain syndrome of the right upper extremity, Type II.  AR at 34.

At Step Three, the ALJ found that the medical evidence in the record did not contain objective signs to establish that Plaintiff's impairments, either alone or in combination, met or equaled the criteria of any impairment in the Listing of Impairments.  AR at 35.

At Step Four, the ALJ acknowledged Plaintiff's contentions regarding his need to lie in bed one to two times a week, his left hand problems, the "jolts" caused by the stimulator, and his headaches.  AR at 36.  The ALJ, found that while Plaintiff's symptoms were reasonably related to his impairment, his allegations regarding his limitations were not entirely or consistently supported by objective evidence, and thus, Plaintiff's allegations of complete inability to work were not entirely credible.  AR at 36-37.  The ALJ found that Plaintiff's RFC is for a limited range of "light" work with a weight restriction of 10 pounds maximum, and imposed the following restrictions on the non-dominant right-upper extremity: no overhead reaching, occasional reaching, no pushing/pulling, no repetitive forceful gripping/grasping, no repetitive fine manipulation, no work requiring discrete digital sensory input, and no overhead work requiring upward gaze/neck extension, and with sit/stand option for a few minutes every 45 minutes.  AR at 37.  The ALJ also found that Plaintiff was unable to perform any of his past relevant work.  AR at 37.

At Step Five, the ALJ cited to the rules contained in the Medical-Vocational Guidelines of Appendix 2 of subpart P of section 404, but relied primarily upon the testimony of the VE in support of his finding that Plaintiff was not disabled.  AR at 38.  The ALJ found that Plaintiff did not have sufficient training to work in AutoCAD on a full-time competitive basis, but could work as a food/beverage order clerk, or telephone quotation clerk, both involving unskilled sedentary work, or as a cashier, which is classified as unskilled light work.  AR at 38.  The ALJ further found that, considering Plaintiff's age, education, work experience, and residual functional capacity, Plaintiff was able to successfully adjust to work that existed in significant numbers in the national economy, and thus Plaintiff was not disabled at any relevant time during the adjudicatory period from June 25, 2002, through December 31, 2003.

### H. Contentions of Parties

Plaintiff asserts that the ALJ erred in a number of respects and therefore, his decision should be reversed. First, Plaintiff asserts that the ALJ failed to fulfill his adjudicative duties related to Plaintiff being un-represented, including the duty to develop the record with medical evidence. Plaintiff's Motion for Summary Judgment and/or Remand ("Plaintiff's Mot.") at 3.

Second, Plaintiff asserts that the ALJ failed to consider the entire evidentiary record and the applicable law when making the Step Two findings. Specifically, Plaintiff states that the ALJ erred at Step Two by: failing to cite and consider Defendant's interpretative ruling of the severity of the impairment; failing to address the Plaintiff's wife statements; failing to apply the appropriate law in evaluating Plaintiff's credibility regarding Plaintiff's limitations; failing to consider that, in addition to CRPS, the medical evidence showed diagnoses of "Bilateral multiple upper extremity neuropathies;" and failing to consider as an additional impairment the permanently placed cervical epidural spinal cord stimulator that caused Plaintiff painful shocks and needed surgical attention. Plaintiff's Mot. at 4-5.

Third, Plaintiff contends that at Step Four, the ALJ improperly discounted Plaintiff's symptom reporting by: failing to acknowledge or consider Plaintiff's written statements about pain, limitations and limited daily activities; failing to acknowledge or consider Plaintiff's wife's statements regarding his symptoms and limitations; pointing to Plaintiff's pursuing worker's compensation remedies and Plaintiff's participation in vocational rehabilitation as undermining Plaintiff's credibility; and discounting Plaintiff's testimony about his need "to lie down one to two days each week." Plaintiff's Mot. at 8-9.

Finally, Plaintiff argues that the ALJ failed to sustain his burden of proof at Step Five and therefore erred in concluding that Plaintiff was not disabled. Plaintiff's Mot. at 9. Plaintiff contends that because he could not perform substantially all of the light work requirements, the ALJ erred in relying on the Medical Vocation Guidelines, even just as a framework, to meet the Commissioner's burden of proof at Step Five. *Id.* Plaintiff also contends that the VE's testimony was flawed and non-responsive to the terms of the ALJ's hypothetical because all three occupations named by the VE (and relied upon by the ALJ in support of his finding of non-disability) required reaching

"frequently" and therefore were not within Plaintiff's RFC, which was limited to just "occasional reaching;" further, the ALJ failed to question the VE about this discrepancy between the VE's testimony and the descriptions in the Dictionary of Occupational Titles. *Id*. at 9-10.

In its Opposition/Cross-Motion, Defendant raises four counter-arguments: First, Defendant asserts that the ALJ fully and properly developed the record, and Plaintiff did not show that relevant evidence was not obtained by the ALJ. Defendant's Motion for Summary Judgment and/or Remand ("Defendant's Mot.") at 3. Second, Defendant asserts that the ALJ properly considered Plaintiff's impairments at Step Two. Defendant's Mot. at 4. In support of the ALJ rejection of the left arm impairment, the Commissioner asserts that Plaintiff reported only intermittent left upper extremity pain brought about by overuse, and none of Plaintiff's physicians assigned any additional limitations specifically related to his left upper extremity that the ALJ did not take into account**.** *Id.* at 5:26-27. Third, the Commissioner asserts that the ALJ provided clear and convincing reasons for not finding Plaintiff fully credible. *Id*. at 6. The Commissioner argues that the ALJ's failure to mention Plaintiff's wife's statements is not reversible error and did not constitute significant probative evidence that would have changed the outcome of the case. *Id*. at 7. The Commissioner also asserts that the ALJ carried his burden of showing that Plaintiff was not disabled, by properly relying on the Medical Vocational Guidelines in conjunction with the VE testimony. *Id*. at 8. In support of his conclusion, the Commissioner asserts that reliance on the Guidelines as a framework was proper because the ALJ took the testimony of a VE. *Id*. Defendant further asserts, that the testimony of the VE in response to the ALJ's hypothetical was not flawed because the ALJ only limited Plaintiff to occasional reaching with his right, non-dominant upper extremity, thus the hypothetical individual was capable of frequent reaching using his left upper extremity. *Id*. at 9.

## III.    ANALYSIS

### A.    Legal Standard

When reviewing the Commissioner's decision, the Court takes as conclusive any findings of the Commissioner which are free from legal error and "supported by substantial evidence." 42 U.S.C. § 405(g). Substantial evidence is "such evidence as a reasonable mind accepts as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Substantial evidence

means "more than a mere scintilla" but "less that a preponderance." *Id*. *Desrosiers v. Sec'y of Health & Human Servs*., 846 F.2d 573, 576 (9th Cir. 1988). Even if the Commissioner's findings are supported by substantial evidence, they should be set aside if proper legal standards were not applied when using the evidence to reach a decision. *Benitez v. Califano*, 573 F.2d 653, 655 (9th Cir. 1978). In reviewing the record, the Court must consider both the evidence that supports and detracts from the Commissioner's conclusion. *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996).

**B.      The ALJ's Development of the Record**

Plaintiff asserts that the ALJ failed to fulfill his adjudicative duties by improperly addressing Plaintiff's lack of representation and by inadequately developing the evidence in the record. The Court disagrees.

**1.      The ALJ Properly Addressed Plaintiff's Lack of Representation**

As discussed above, the Administrative Record shows that the ALJ questioned Plaintiff to determine whether Plaintiff had a right to an attorney and Plaintiff – who had been represented by counsel in connection with a previous application for benefits – acknowledged at the hearing that he understood he had a right to an attorney and that he chose to proceed on his own behalf. AR at 437. In addition, the Administrative Record shows that Plaintiff was informed of his right to representation in the initial notice, the reconsideration notice, his request for an administrative hearing, the notice of hearing, and the hearing decision. AR at 60, 67, 68, 69-70, 71, 72-73, 75. Plaintiff has not cited to any authority suggesting that this evidence is not sufficient to show that Plaintiff knowingly waived his right to representation or that the ALJ's duty required more. Accordingly, the Court rejects Plaintiff's assertion that the ALJ erred by inadequately addressing Plaintiff's lack of representation.

**2.      The ALJ Adequately Developed the Record**

In social security cases, the ALJ has a special duty to fully and fairly develop the record and to assure that the claimant's interests are considered. *Smolen*, 80 F.3d at 1288 (*citing Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir. 1983)). This duty is heightened when a claimant is not represented by counsel, in which case the ALJ must "'scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts.'" *Cox v. Califano*, 587 F.2d 988, 991 (9th Cir.

1  1978) (*citing Gold v. Sec'y of Health, Educ. & Welfare*, 463 F.2d 38, 43 (2d Cir. 1972)).  Further,

2  the ALJ must be "especially diligent in insuring that favorable as well as unfavorable facts and

3  circumstances are elicited." *Id.* (*citing Rosa v. Weinberger*, 381 F. Supp. 377, 381 (E.D.N.Y. 1978).

4         Plaintiff asserts that the ALJ failed to adequately develop the record, pointing generally to a

5  letter by Plaintiff containing "considerable treatment information that was not addressed in the

6  unfavorable decision."  Plaintiff's Mot. at 4.  The letter was written by Plaintiff following the ALJ's

7  decision and describes Plaintiff's condition in some detail.  *See* AR at 24-28.  Plaintiff has not,

8  however, identified specific information with respect to which the ALJ failed to adequately develop

9  the record.  Therefore, the Court is not persuaded that the ALJ erred in this respect.

10         **C.     The ALJ's Consideration of Plaintiff's Impairments at Step Two**

11         Plaintiff asserts that the ALJ erred when he failed to find at Step Two that Plaintiff's

12  diagnosis of bilateral multiple upper extremity neuropathies – an impairment that affected Plaintiff's

13  upper extremities on both his right and left sides – did not constitute a severe impairment.  Plaintiff

14  further asserts that the cervical epidural spinal cord stimulator should have been found to be a severe

15  impair impairment because Plaintiff suffered from painful electric shocks as a result of using it.  The

16  Court concludes that while the ALJ did not err in declining to find that the epidural spinal cord

17  stimulator was a severe impairment, he did err with respect to Plaintiff's diagnosis of  bilateral

18  multiple upper extremity neuropathies.

19         As noted above, at Step Two, the Commissioner considers whether the claimant has a

20  "severe medically determinable physical or mental impairment" or combination of such impairments

21  that has lasted or is expected to last more than 12 months.  20 C.F.R. § 404.1520(a)(ii).  An

22  impairment is severe if it "significantly limits [the claimant's] physical or mental ability to do basic

23  work activities."  20 C.F.R. § 404.1520(c).  In determining whether an impairment or combination

24  of impairments is severe, the ALJ is required to consider the claimant's subjective symptoms, such

25  as pain or fatigue.  *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir.1996) (citing 42 U.S.C.

26  § 423(d)(2)(B) & SSR 86-8).  "[T]he step two inquiry is a de minimis screening device to dispose of

27  groundless claims."  *Id.* (citing *Bowen v. Yuckert*, 482 U.S. 137 at 153-54 (1987)).  "A claim may be

28  denied at step two only if the evidence shows that the individual's impairments, when considered in

combination, are not medically severe, i.e., do not have more than a minimal effect on the person's physical or mental ability(ies) to perform basic work activities. If such a finding is not clearly established by medical evidence, however, adjudication must continue through the sequential evaluation process." SSR 85-28.

Here, the ALJ acknowledged the evidence in the record indicating that Plaintiff had been diagnosed with peripheral neuropathies in both arms, AR at 35, that he suffered pain in his left upper extremities, *id.*, and that he had lost 40% of his "left upper extremity strenuous gripping or handling or repetitive gripping, handling or fingering." AR at 36. He also acknowledged that Plaintiff testified that he had "some left hand problems." *Id.* He did not, however, explain why he did not consider Plaintiff's bilateral peripheral neuropathies to be "severe" in the face of this evidence. Nor did he explain why he considered this impairment to be non-severe in light of uncontradicted statements by examining physicians, as well Plaintiff himself, that overuse of Plaintiff's left arm to compensate for his right arm limitations exacerbates his pain. As noted above, the ALJ was required to consider such interactions between Plaintiff's impairments in determining whether any particular impairment should be considered severe. There is no indication that ALJ did so in this case. Given the low burden that Plaintiff must meet at Step Two, the Court concludes that the ALJ's failure to consider Plaintiff's diagnosis of bilateral peripheral neuropathies is not supported by substantial evidence.

On the other hand, the Court concludes that the ALJ did not err in failing to find that Plaintiff's cervical epidural spinal cord stimulator constituted a severe impairment. A finding of disability must be based on impairments that are "medically determinable," that is, "anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques." SSR 03-2P. "The Act and regulations further require that impairment be established by medical evidence that consists of signs, symptoms, and laboratory findings, and not only by an individual's statement of symptoms." *Id.* Here, Plaintiff has not cited to medical evidence that the cervical epidural spinal cord stimulator is itself an impairment. Rather, the treating and examining physicians are largely in agreement that this device has had beneficial effects for Plaintiff. Accordingly, the Court finds that the ALJ did not err in this respect.

**D.     The ALJ's Consideration of Plaintiff's Credibility**

The ALJ concluded that Plaintiff's pain was "genuine," but that his allegations regarding his limitations are not entirely or consistently supported by objective evidence. The Court concludes that the ALJ erred in failing to address the limitations described by Plaintiff's wife.

A claimant's credibility in a Social Security hearing is the degree to which the claimant's statements can be believed and accepted as true. SSR 96-7p at 4. ALJs must make credibility findings to determine the truth of a claimant's description of her symptoms and pain. *See Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996) (holding ALJ responsible for determining credibility and resolving conflicts in medical testimony). When making such findings, the ALJ "must consider the entire case record and give specific reasons for the weight given to the [claimant's] statements. The reasons for the findings must be grounded in the evidence and articulated in the determination or decision." *Id.* Further, "[l]ay testimony as to the claimant's symptoms is competent evidence which the Secretary must take into account . . . unless he expressly determines to disregard such testimony, in which case he must give reasons that are germane to each witness." *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996) (citations omitted); *see also Stout v. Commissioner*, 454 F.3d 1050, 1053-54 (9th Cir. 2006) (holding that ALJ erred in failing to consider lay testimony that was relevant to claimant's ability to work).

The ALJ offered the following specific reasons in support of his credibility determination:

> Claimant's daily activities, which include some driving, some housework, walking the dog, and gardening, and his ability to successfully complete vocational retraining all suggest a capacity for some range of work, as suggested by many physicians who have examined or treated the claimant. In that regard, none has opined that claimant is entirely unable to work. Indeed, some recommended retraining. The most significant limitations opined have addressed repetitive, strenuous, or overhead use of the upper extremities, which limitations I have incorporated into the RFC. Claimant admitted he has had improvement in his symptoms as a result of the stimulator. His need to lie down one to two days each week appears related to his level of activity, such as in "wiping down the car" (testimony). I note that at the time of the hearing, claimant's worker's compensation case was still pending, a factor possibly influencing claimant's motivation and decision-making.

AR at 37.  The ALJ did not, however, address the lay testimony of Plaintiff's wife, including testimony that was relevant to Plaintiff's ability to work.  For example, Plaintiff's wife stated in her Third-Party Function Report that Plaintiff "usually takes at least one nap during the day, depend[ing] on his pain" and that he is "awake a lot during the night due to him adjusting his stimulator;" that Plaintiff is "sometimes unable to take his shirts off;" that he cannot "fold the laundry, mow the lawn or vacuum;" that he has a "hard time carrying the [grocery] bags;" and that he does not engage in any social activities on a regular basis because of his pain flare-ups.  AR 124-132.

The ALJ did not consider this testimony or offer reasons for disregarding it.  In failing to do so, the ALJ erred.

**E.    The ALJ's Findings in Step Five that Plaintiff is not Disabled**

Because of the ALJ's errors, discussed above, the Court concludes that his ultimate conclusion at Step Five is not based on substantial evidence.

**IV.    CONCLUSION**

For the foregoing reasons, the Court GRANTS IN PART and DENIES IN PART Plaintiff's motion for summary judgment and GRANTS IN PART and DENIES IN PART Defendant's motion for summary judgment.  The Court reverses the ALJ's decision and remands Plaintiff's claim for further administrative proceedings consistent with this opinion.  Upon remand, the ALJ is instructed to consider whether the diagnosis of bilateral multiple upper extremity neuropathies is, either by itself or in combination with the other impairment, severe.  The ALJ is further instructed to reconsider the evidence relating to Plaintiff's pain, including the statements of Plaintiff's wife relating to Plaintiff's work limitations.  Should the ALJ reject the testimony of Plaintiff's wife, the ALJ shall provide written reasons for doing so that are supported by substantial evidence.  The ALJ shall then determine the Plaintiffs' RFC in light of these considerations and revisit the question at Step Five of whether Plaintiff was disabled.

IT IS SO ORDERED.

Dated: February 11, 2008

JOSEPH C. SPERO
United States Magistrate Judge